Welcome to the United States Court of Appeals for the Third Circuit. And hopefully everyone had a terrific Labor Day weekend. We're glad to see everyone. We have one case on the docket today. Davis versus Attorney General number 21-2235. And counsel, we'll hear from you first. Thank you, Mr. Chief Judge. Good morning. Good morning. May it please the court. John Pang on behalf of the petitioner, Damien Glenroy Vando Davis with the court's permission. I'd like to reserve four minutes for rebuttal. That would be granted. Thank you. Before jumping into our discussion today, your honors. I wanted to note that while Mr Davis is not with us in the courthouse, he expressed to me his great desire to be with us. He, however, has been detained for nearly four years now by the Department of Homeland Security. While he's been litigating his claim for U.S. citizenship. And so now on to the claim for citizenship. I'd like to begin by addressing the questions this court posed in its pre-argument letter on standing. Great. And so first, Mr. Davis possesses Article 3 standing here because unlike the law at issue in Brandau, the Status of Children Act first does not override the Jamaican Legitimation Act of 1961. That act still reigns that legitimation requires the marriage of the parents. Second, the mechanisms in place in the Cape Verde law included certain presumptions of legitimation. That is, under Article 6 of that act, paternity is presumed for the father, even when there is no marriage. And under Subsection B of Article 6, if a man is cohabiting and open with the mother, then the child is presumed to be the child of the father. And then there are mechanisms for either the child or the alleged father to challenge that assumption. And so it's an assumption that you are the father until something happens in court where you would challenge the affiliation and that that would reverse the overall arching assumption. Article 8, I think also, or Article 9 also provides that in the case where a mother and a father are not married, the mother must designate who the father is to the best of her ability. And so you have at birth this process where the mother says, this is the person who is the father of this child. And again, there are the mechanisms for challenging that if that doesn't hold true. Our case law, though, simply said that if the, in that case, the Cape Verde statute eliminated the distinction between, eliminated the status of illegitimate children, why isn't that enough? The fact that the Jamaican law eliminated the status of illegitimate children. I think maybe for three reasons. The first is because the Status of Children Act sought to encourage the elimination of discrimination against unlegitimated children, but it did not disturb the actual principle of how to legitimate a child. I think that's the distinction that the BIA has really latched onto. First, the matter of Clayhart in 1983, the matter of Hines in 2008, and the matter of Cross in 2015, where it said there are these certain distinctions where Jamaica still holds legitimation to have some significant factor in the action of laws. I'm sorry to interrupt you. You mentioned the Jamaican Legitimation Act. Did you submit that? I couldn't find that. I didn't see it. Where can I find that? No, we didn't submit it. It's not on the record, Your Honor. I think that was just in preparation to answer the Court's questions in the letter. And so I think the BIA's determination in these two contexts, right? So right now below, the BIA said Kay Verde eliminated these distinctions. You have this clear declaration in Article 2 that says we no longer want a distinction between legitimation and unlegitimation because that is a vestige of the colonial era. And in that case below, the BIA said, yes, this child is legitimated under 1432. But in all these other cases involving Jamaica, the BIA has struck and said the nuance here is Jamaica still maintains this legitimation principally through the 1961 Act, and that's why we are still going to find that the 1432 legitimation requires marriage in the Jamaican context. I think those cues are helpful for maybe deciphering the difference between the two laws and why we believe, for our purposes, Mr. Davis still has not been legitimated under the original meaning of 1432. Can you address third-party standing then? Yes, Your Honor. And so I think on third-party standing, it's probably an easier question because so in Teneo, the test is whether there's a close relationship and whether there's a hindrance. So here I think close relationship is pretty easily satisfied. You have a child who suffers an injury because of the father's violation, and so I think there's at least a close relationship for Mr. Davis to be able to assert those rights. The hindrance is slightly different because in Teneo, of course, the father was deceased by the time the action was brought. But here, I can't think of a cause of action Mr. Davis's father would in the present day be able to vindicate his rights. That is, the only mechanism, cause of action in district court is under 8 U.S.C. 1503, where a district judge could find nationality for a person and it would be a declaratory judgment. But the district judge cannot grant that relief if there are removal proceedings that have begun. And so here, the government's action to bring removal proceedings... The thing that Davis's dad couldn't have brought that action? From my reading, Your Honor, I don't believe so. And granted, you know, I didn't uncover too many of those types of actions under 1503. Well, the only reason why I was a little bit confused is because you said because there are removal proceedings going on that it would be he couldn't. But there's no removal proceedings against the father, right? There are, but so I think the way the statute is written is that a district judge cannot override whatever is found in the removal proceedings. So from my reading, once removal proceedings began here for Mr. Davis, and the board found that Mr. Davis is removable, I think a district judge couldn't come back in and declare citizenship for Mr. Davis. Because the relief sought there wouldn't be his father's citizenship, it would be his citizenship. So are you saying the hindrance then is that Davis is already a removal proceeding? Yes. From my reading of 1503, I don't think there is any action that Mr. Davis's father would be able to bring in the present day that would grant the relief that Mr. Davis seeks, which is citizenship. But is that sort of a form of self-imposed hindrance? Because a lot of actions could have been taken by the parents before Davis was put into removal proceedings. Isn't that right? So I don't believe it's a self-imposed hindrance. Or a delayed hindrance? I mean, there was relief available whereby Davis could have become a citizen well before he was put into removal proceedings, correct? That's correct, Your Honor. And so I'd hope to break that maybe into two parts. I think the first part maybe takes us to Morales-Santana and then to NEO, where the father was deceased. But in those cases, the father also had many opportunities prior to the actual action to bring the case. It was just by the time the removal proceedings progressed to the circuit levels and then the Supreme Court, the father was deceased. I think it would be slightly weird if we said, you know, God forbid, if something happened to Mr. Davis's father, that would then take the case back into the Teneo-Morales-Santana line of saying there is hindrance because the father is then deceased. And so that's why I think maybe the focus should be on the close relationship. That is, the injury here flows directly to Mr. Davis because of the violation here. Well, what rights does the unmarried dad have? I mean, he comes to the U.S. in 1982, correct? That's correct. And at this point, the relationship was ended or about to be ended, correct? Correct. And mom remarried. Yes. When did mom remarry? I don't know that that's specific in the record, Your Honor, but definitely by the time that his dad naturalized. So that was 1994. Well, and mom comes with Davis to the U.S. in 89, correct, seven years after dad. That's correct. Is mom married by the time she gets to the U.S. in 89, remarried by the time she comes with Davis? I can't confirm that. I think the best evidence we have for that is maybe 763. These are notes from an affidavit Mr. Davis provided that said when he first came to the United States, he resided with his mom and his stepfather in Brooklyn, New York. And so I would presume so, but I don't think it's confirmed for me. You're saying 763 of the A.R.? Of the A.R., correct, Your Honor. Don't panic. We're going to be asking you some questions beyond the time. Okay. If we could go to PROSA for a minute. In reading this, and I'm not sure this is an argument that was made or addressed, but, you know, subsection 4 says that the naturalization has to take place while a child is under the age of 18 years. I think we can all agree that, I mean, at least notwithstanding some of your arguments, he was not the naturalization did not take place while he was 18, and it was based upon later events. Based on the specific language of the statute, is what happened after, you know, with the Supreme Judicial Court of Jamaica and Brown or whatever, is that even material? If you read the statute, I mean, can't this be read or shouldn't it be read as after the age of 18, it doesn't matter what happens? Because now what you're arguing is based on what happened many, well, decades later, that there's a whole new class of people who can become citizens. And I don't know whether that's what Congress intended or not. So how do we deal with that subsection 4? Yeah. And so, Your Honor, if I could just clarify, you're saying because of retroactivity, whether we should. So here I believe. Well, I just want to go by the, not even so much retroactivity, just sticking by the plain terms of the statute. It says such naturalization takes place while such child is under the age of 18 years. Wouldn't that be, shouldn't that be read as once you turn 18, it doesn't matter what happens after you're 18. Right. And that's the end of it. What's your position on that? Yeah. Thank you, Your Honor. So our contention is that, so Mr. Davis' father did naturalize before Mr. Davis turned 18. And I think that is the trigger here. Okay. And so that's why we think PROSA does show that there was a legal separation. First, a legal union when they started their relationship in 1976. By 81, they had satisfied the five years of mutual cohabitation. And then by 82, when they separated, that would solve the A3 legal separation requirement, giving Mr. Davis' father the right to be able to transmit citizenship to his son so long as the son is in his legal custody. And that was also the case. Well, that brings me to my next question. The record, where in the record can we determine who had legal custody of Davis? I mean, I really didn't see anything on that. I'm not sure. I read various things. It was a co-parenting, but there was no agreement. Who had, you know, quote, unquote, legal custody for purposes of the statute? Yeah, Your Honor. And I do acknowledge I think the record is slightly bare on those facts because the agency only addressed the legal question, whether PROSA applies retroactively and whether that actually changes the analysis. So I think the best evidence is 763 of the record. These are, again, Mr. Davis' notes, affidavits, sworn affidavit about his living conditions once he came to the United States. He spent significant time with his father in Staten Island from 11 to 15. Slight separation, you know, going back and forth between the parents. Well, wait a minute. It says he went, so he said that 763 says he went back with the mom at 15. Right. And he went back with his dad. They went to Jamaica for seven to eight months. And then he came back to the U.S. and lived with his mom around age 16. He lived with his mom in Brooklyn for a few months and then moved out with his first wife at age 16. Right, right. And so it isn't very clear as far as the dates fully lining up. I think here is kind of my general understanding of legal custody as it's been evaluated in the past. So in Brandau, Morgan, Teneo, legal custody in family law is usually assumed once parenthood has been established until there's been some event that severs that. So in U.S. jurisdictions, that may be a divorce where there is a finding from a family court saying there's joint custody here, there's legal custody for one parent but not the other, et cetera. But your argument is that they separated before that, right? That is. But we don't have that declaration of who has what custody. But it's your burden, isn't it, to show us that there was legal custody? I think so, yes. It would be our burden. But I believe that would be more a factual matter that hasn't happened. So that would mean we need to remand for full hearing in a district court. If your honors reaches the path that we presented, I think we would be in favor of that. Can you tell me where this was argued in our briefing or the briefing below, really focusing on legal custody? Because that's something you have to show, right? And it's your client's burden. Where was that argued? I didn't see it in our briefing and I didn't see it in the briefing below. Was it before the BIA or the IJ? Well, so no, not precisely, Your Honor. And in part it's because if we go to the transcript of the IJ, the IJ only focuses on the marriage and then PROSA. The board does the same, right? The board says we're going to look at PROSA. We don't think it applies retroactively on our reading of Brown. And so then they assumed essentially the other facts and said we don't need to breach those because we're going to find on the legal question that there was no legal separation such that his father could never even transmit citizenship. And so I think that's why. And yet we have jurisdiction because, as the government pointed out in its footnote, this is a question of citizenship, so there's no exhaustion requirement. We do. But to Judge Montgomery-Reeves' point, we are kind of flying blind here, right? I mean, this is not what we do. We're not fact-finders, right? Right. And, Your Honor— There appears to be a lot of factual cloudiness here, isn't there? Right, Your Honor. I think if we are at the stage where we say that at least the board got it wrong on its analysis of PROSA, I would support Your Honor's perhaps point of sending this to district court where those facts could be resolved, where we could have actual— Well, I'm suggesting the facts are at issue on the gender discrimination claim, not on—because of the custody issue. You've got to show that dad has custody in order to be—to prevail on the gender discrimination claim, I think. And it's only an as-applied challenge. You concede the statute's okay on his face. You're making an as-applied challenge on gender discrimination, right? That's right, Your Honor. Same one as in Teneo where this court said, right, legitimation in other forms could be much looser than the marriage requirement. I mean, on the marriage, I just don't see it in the record to show that there was a marriage. And if you don't have a marriage, you can't have a separation. So that's why I'm focused on the gender discrimination claim. What am I missing on the first argument? So on the gender discrimination claim, our focus is on legitimation. That is— Right. No, but I'm going back for a minute on PROSA and marriage and separation. I don't—I don't see that as a credible—I see your gender discrimination argument as a credible argument, but I'm not seeing it on PROSA. So what am I missing on that? Yeah, Your Honor. So I think the—on that piece of the argument, it really falls under, you know, do we want to heed what the Jamaican court has told us about their laws? I think that PROSA was— Yes, we do. The case law says we do. Right. But that—I went through that whole Jamaican law. It's all about property. It's all about the rights of unmarried people and the distribution of property. It doesn't answer the question about what a definition of a marriage and a separation is. And so I think we can take cues, though, from the language that the Jamaican legislature used, right, which is to define all of these in terms of spouse. Well, let me ask you something on that. If you look at two questions, number one—and I want you to come back to this one—but I didn't see any case that wasn't a property case. So do you have a non-property case that you can point us to, a Jamaican non-property case? And then number two, when I look at the express language of PROSA, I don't see a definition that says, you know, that directly recognizes common-law marriage. To the contrary, it seems to me that if you look at section after section, there is a recognition of both marriage and cohabitation. Why wouldn't we read that actually to suggest that there continues to be two different things? Cohabitation for five years does not equal marriage. They just allow people to have property rights if they've cohabited for five years. Right. And so on the first question, Your Honor, I don't think we have a direct case just in Jamaican courts resolving the issue of a proper marriage. But I think that's in part because a lot of times in spousal relationships, the division of property is kind of the crucial thing to do if there's been a separation. That is, if you're in a union, you don't need to go into court to kind of declare that, especially when common-law partnerships are so prevalent in Jamaica and were so understood to be kind of a prevalent type of relationship. And so I don't think that you would necessarily need to go into court to get a declaration that you had a common-law marriage. And so that's why I think most of the cases come out in the property dispute sense, because those are cases where people have separated and now they want their rightful share to the spousal property. I think, to Your Honor's second question about the language here, and I think, again, spouse is really the driving key to me, which is in Section 2 of PROSA, spouse is defined as a man, a single man who holds a single woman out as if they are husband and wife for a period of five years. And that makes the common-law marriage. I think it might not track to what we're typically accustomed to for the joining of two partners, but that's how Jamaican legislature has crafted it. And I think Brown reinforces that. And so each justice went through, I think in painstaking detail, I think it was a 71-page opinion, to go through that this would have a grand and big effect for Jamaican society, because they were saying we used to always have these legal marriages, but then now we are recognizing that common-law partners should also be identified as common-law spouses and that they then have a right to the common-law spousal property. Does it matter at all that in each of the cases that you all provided to us the couples were actually married? As far as I can tell in the facts of the cases that you submitted to us, there were no common-law marriages. These were all cases of folks who were actually married. Does that matter at all? So those cases we really did try to provide to the court to answer the second question the motion panel presented to us, which is, is Brown still the controlling case? And so those cases I think at least it was easily settled that Brown was the presiding case and that retroactively folks. And so we didn't present those cases to try to prove up the retroactivity point. I think Brown to us gave us a clear statement from the Jamaican's highest court, and again with all the attention that was given to PROSA and evaluating its effects for Jamaican society. And the First Circuit in Thompson, they went against your argument. They said it was not, PROSA was not retroactive back to 1992. If we adopt your argument, we're going to create a circuit split, right? And if not, how do we distinguish Thompson? Right. I think it would be a slight circuit split on the finding, but not on the rationale. Because in the First Circuit, the court said no one was able to point to any case talking about PROSA being retroactive. And so the court naturally read PROSA to be proactive and said that it would only apply after its enforcement date. But here we do have Brown. And Brown I think is a significant difference between the Thompson case, where Brown the justices go through and say that it would be a bizarre reading and it would be an unjust reading to say that PROSA would only apply to people who, that was in the context of a couple that was married when the act was passed and ceased to be married before its effective date. So that really addresses an interregnum period. That's true, Your Honor, but I think that would also, I don't think the Jamaican court would have reached a different conclusion if that couple had been in a 10-year or 15-year relationship and somehow ended their relationship just before the enforcement date. I think the court would have still given the same weight to PROSA in saying, you were common law partners for a period of 10, 15 years, but you ended it right before the enforcement date of PROSA. That shouldn't deprive you of the spousal right that's now been given to you by the Jamaican legislature in PROSA. But if you lose on that issue and we go to gender discrimination, do you concede that an evidentiary hearing is required because this record is just too indefinite? You don't have enough on this record. Well, so gender discrimination, Your Honor, I think part of the challenge, too, and I hope I'm answering Your Honor's question. Part of the challenge, too, is like in Teneo, legitimation kind of stops the entire flow of events that could have happened. And so we are dealing with events that we can only predict what would have happened. I think a reading of what happened when Mr. Davis' father naturalized in 1994 is that the couple was separated. His mother had remarried, and they were split in custody of Mr. Davis. But because we never kind of answered the legitimation problem, that is because if we assume that they were never married and Mr. Davis' father can never satisfy the legitimation problem, you have a situation like Teneo where that becomes the original problem that I think should be addressed through provision of remedy, which is extension just like in Teneo. Right, but your claim is as applied, not facial. Correct. And in order, as I understand it, to win your as applied claim, you've got to show that dad is not the typical father, the unwed father, because you've conceded the validity of the face. You're not making the facial challenge. So that means that there is some government interest in preferring the biological mother over the biological father in the unwed case. So I read your brief to be saying our father is different. Davis' dad is different than the typical dad, and the reason he's different than the typical dad was because he had custody of his son. But the record is all over the map on this custody issue. That's why I'm pressing you as to isn't it the case that a full-blown evidentiary hearing is required in order to determine exactly what the arrangement was, what the facts are, where he lives, when he lived there. All we've got is these handwritten notes, which I think that's from a DHS official, right? Correct, yeah. Yeah, Your Honor, if Your Honor does reach that question. Didn't your client actually say he has no knowledge of any legal custody agreement? Not that I could recall. I believe the only statement to that effect was he didn't know the status of his father's citizenship. I believe that was an answer that was supplied, but I don't know about legal custody. To Your Honor's question. Whatever statements or admissions that are in this administrative record, maybe I'm channeling the trial court too much here, but it seems to me that those are all the things that need to be tested under oath in a full-blown hearing. They're not to be taken lightly. They're not matters that should be addressed through offhand comments or arguments in brief made by lawyers. And fair enough, Your Honor. I think if this court was thinking about maybe that remedy prong, right? If we have you on the kind of legal backing to that, then I would agree that certain of these facts should be resolved at a district court. If I could slightly maybe push back, though, I don't think we're here contesting that Mr. Davis's father was an abnormal father, a different father. I think we're saying that he was deprived of his rights even to be acknowledged as a father simply because legitimation required marriage. And I think this court did, and to now in clear terms. This sounds like a facial attack on the legitimation requirement. That's different than what you've argued in your brief, I think. Your Honor, we're making an as-applied challenge to the legitimation prong, just like in Teneo. And the reason we don't make the facial challenge is I don't believe this court would need to reach the facial challenge before it hits the as-applied challenge because, as Teneo said, there might be many foreign jurisdictions where paternity could be established, where legitimation could be established through many other means. But it's because the jurisdictions at issue here, the Dominican Republic in Teneo, Jamaica here, requires marriage that makes it an as-applied challenge. We have a jurisdiction that really restricted what legitimation would require, and that's what violates equal protection now, that there is no important government interest served today of restricting legitimation to marriage in that context. I want to go back to a discussion you were having about legal custody and what needs to be remanded or not. As I understand your point, if you look at 1432A.3, there are two prongs. The first prong is naturalization of the parent having legal custody when there is a legal separation of the parent. And then the second prong is the naturalization of the mother if the child is born out of wedlock and the paternity of the child has not been established by legitimation. It's my understanding that you're basically saying, we don't need to have arguments about legal custody as it relates to the second prong. That's not an issue in the second prong of Section 3. That's only an issue in the first prong. Is that right? Not exactly. And I think this was the Chief's question on Section 4. I think legal custody always needs to be established for derivative citizenship purposes. I think our point was just, so like in Teneo, Teneo was first a decision about the legitimation prong in A.3, and the court said Teneo's father was completely precluded from ever legitimating because of marriage. And the actual derivative citizenship statute at issue was A.2. It was the death of the mother. And so the court was saying, we have kind of this original problem with legitimation that precluded Teneo's father from ever even gaining that initial right to be able to transmit citizenship that would open up the rest of the statute. And so I think our challenge here flows much the same way, that it's a challenge to the legitimation that Mr. Davis's father was precluded from being established as Mr. Davis's rightful father. And so then he had no essential opportunity to take any of the steps, such as in the first prong of A.3, legal separation, that would have allowed him to transmit citizenship. Can I ask you about another thing? Okay. Sticking with subsection 3, legal separation. Our Morgan case requires something a little more formal, like a court decree or something. We don't have anything like that here, do we? We don't. We have people saying we broke up. Does that meet legal separation under our law? Right. So I think under, if we're looking at the first path about PROSA, I would say yes, Your Honor. And I think the case I would maybe ask is on point is Jafal of this court in 2022, Jafal v. Director of Newark, New Jersey Field Office. We didn't cite it in our briefs, but it's 23F4275. And so in that case, it was talking about Jordanian legal separation, and this court said the determination of legal separation. Can you say it again? Sure. 23F4? Right. F4275, decision of this court in 2022. And so in that case, the court was concerned with Jordan and legal separation there, and it said, and it kind of explained what Morgan stood for, which is that you need this formal decree, but it said we don't need that formal decree when a foreign jurisdiction tells us that there is a legal separation under their terms. And so here I think PROSA works in that matter where I know the government has argued that PROSA doesn't create the circumstances for a legal separation, but I think Section 2 and Section 12 both do. So Section 2 talks about spouses of PROSA, talks about spouses and says they cease being spouses once the cohabitation ends. And then Section 12 says entitlement to the property only flows to at the time of termination of cohabitation. And so I think a plain language reading of PROSA and then how it was interpreted by the court in Brown shows that the ending of cohabitation is the marker of the end of the common law relationship. And under Jaffa, I think that would be appropriate under this court's law of saying that is a valid legal separation when it's looking at a foreign jurisdiction. So I understand it's not maybe clearly mapped onto what we would understand to be a legal separation, but I do think Jamaican law gives us enough to show that there was legal separation under their terms. I just had one last question for you. You know, we're obviously dealing here with a statute that is no longer in existence. Eventually we're going to have to resolve this in an opinion. Does this affect many people? Are there many other folks in proceedings or otherwise who would be affected by this law, even though it's been out for years? Your Honor, we try to figure out that, and certainly in other cases we've tried to explore what that number is. And we couldn't get a good number, Your Honor. And I think, one, I think there are certain practical restrictions to that class of people. One, this law was overturned by 2000, right? And so it doesn't affect anyone that was born after 1982. And, two, I think if we're looking at the first half about common law relationship, you would still need that actual common law relationship of at least five years, right? And so that would restrict some of the subclass. And then I think beyond that, you know, we've tried to also press this race-based claim because I think that provides good context to this enactment in 1952. And partly, though, that relates to Your Honor's question, is that in the 1952 Act there were sharp restrictions on the people from Jamaica, from the Caribbean islands, Bahamas, to come to the United States. And so it's not a large population because Congress affirmatively restricted and placed quotas on the people that could come in from these countries. And so that number would also be restricted by just that action. Okay, great. Thank you, Your Honor. We're hearing on debacle, and now we'll hear from the government. Good morning. May it please the Court? Lindsay Vick on behalf of Respondent. I'd like to take us back to the core issue here, which is legal separation and not the legitimation clause of 1432A3. And that simply is not before the Court. And that is because we have to look to the purpose of former 1432A3. And that is because that statute recognizes that parents have joint parental rights over their child. And U.S. law attempts to protect those rights where both parents are known and alive. So you're saying the legal custody thing we've been talking about is really a nonstarter? The legal custody is an element that has to be shown for derivative citizenship under the statute. And our position is that Petitioner has failed to show a genuine issue of fact related to that element. It was never argued below. It hasn't been argued before this Court. And so he failed to raise a genuine issue of fact. Well, it's been mentioned in this Court. I mean, counsel conceded that it wasn't raised in the agency, but as your footnote points out, we have jurisdiction to consider it, right? Correct. And in their brief, they do mention that Davis went to live with Dad after he came in 89. And there are notes from the Homeland Security officer supporting that. So that's something to indicate that there was possibly joint custody, right? Right. If I remember correctly, Petitioner did not make any meaningful arguments regarding legal custody. And I don't believe, I don't remember there being a cite to where they stated that Petitioner was living with his father. Well, I think it's page 7 of the opening brief, I think. Let me see. Bottom of page 7, on November 2, 1989, when he was 11 years old, Mr. Davis was admitted into the United States as an LPR. After his arrival, he resided for a brief period of time with his mother and stepfather and thereafter lived with his father, Delroy, in Staten Island, New York. What are we to do with that? Well, I think, as Your Honor noted earlier, that this is not a court that finds facts, and so transfer would need to occur under 1252b-5. Yeah, this should go to a district court so that issue can be fully litigated, right? Correct. Our first position is that he's failed to show a genuine issue of fact, but if the court finds there is an issue of fact, it would need to go to the district court. That's correct. How about the legal separation point that you were going to raise? You've read our Morgan case. Is that met here? That is not met here because Petitioner has failed to show a formal government action related to legal separation. And even if we are to consider his parents to be common-law married, which our position is that they are not common-law married under the PROSA, he has not shown any facts that would show a formal government action under this court's precedent in Morgan. Well, doesn't our case law also say, though, that the legal separation requirement of 1433 can be met without a formal adjudication if the relevant jurisdiction recognizes that? Correct. And Jamaican law does not speak to legal separation for common-law spouses, and that is because the PROSA solely concerns property disputes between spouses or common-law spouses. And it does not stretch as far as to cover child custody issues or validation of marriage or divorce issues. It simply concerns transactions with respect to property. Further, and that's the plain language of the PROSA, the PROSA also does not authorize the courts to issue orders other than relating to property. It doesn't allow the court to issue an order validating or acknowledging a marriage or a divorce. And so we would argue that the PROSA, it solely concerns property disputes and it doesn't speak to the common-law marriage, the validation of its existence, or legal separation thereafter. And also, with respect to its retroactivity, again, I think we would argue that the Brown v. Brown decision does show that the PROSA would be retroactive, but, again, that would be for property disputes. It does not retroactively acknowledge common-law partnerships for all of time. Does the government concede that would be retroactive forever? I mean, going back indefinitely? Brown v. Brown seems to – I think it does say the word indefinite at some point, and so it seems that is what the court there has held. But, again, our position is that that is for property disputes and not for the acknowledgement of common-law marriages for all of time. And so going back to the core issue here with whether he's met his burden for derivative citizenship, eliminating the legitimation requirement here would not have helped petitioner or petitioner's father, and that's because the paternal relationship for him to naturalize through his father would still need to be established because he needs to drive through a naturalizing parent. And the exception for the unwed mother only applies when paternity has not been established, or, in other words, when the father is unknown. And when both parents are alive – Well, that brings us to one of the things we asked you about was the birth certificate. And you said you have it and you've shared it with the other side as part of the A file. Correct. Can you give us the big reveal? Is the dad on the birth certificate? He is not. Okay. All right. But we do know – That means there's no dad listed or there's a different dad listed? If I recall correctly, there's no father listed. Okay. All right. Thanks. But this whole case, in every respect, suggests that Delroy – I think it was Delroy is the father, right? The actual father. Correct. I don't see anywhere in the record – You don't dispute that. No, no. And paternity has not been disputed. And so this is a situation where we have two parents. We know who the dad is, but it's an unwed situation and we don't have a marriage, according to your view. And because we don't have a marriage, we can't have a separation. Correct. All right. So that means issue one, if we agree with you on that, then Davis can prevail only if he shows gender discrimination or race discrimination. Well, I believe he can only prevail if he shows legal custody, because the only issues before the court are legal separation and legal custody. And the equal protection claims go to the legitimation clause, is my understanding. But doesn't the equal protection claim also relate to custody? Because if dad didn't have any custody – if dad was a biological dad with no relationship with the child living in the U.S., that would thwart their as-applied challenge that dad suffered some unfair treatment because of his sex, right? That would just be the type of unavailable or non-participating father that the statute is discriminating against, right? But for the legal custody requirement, the legal custody requirement doesn't differentiate between mothers and fathers. And so that's a separate requirement from the legitimation clause. Right. Right. No, I'm just suggesting that if he's going to have any chance to prevail on gender discrimination as applied, the father has to show that the father had a custodial interest in Davis. Because if he didn't, that doesn't distinguish him from the typical person that the statute aims at. And it's a given here that the statute is okay on its face because they haven't challenged it facially. Correct. And that goes to the fact that he would have to show custody. But that situation isn't at issue here because, in our case, the mother is alive or was alive up until his eligibility for derivative citizenship expired. And so that's the key point that we're looking at here. And that just shows that, I mean, we know that if mom had naturalized before Davis reached majority, that by operation of law, Davis, too, would have been naturalized, correct? If he met the other elements, the legal custody element. With mom. Correct. Yeah. But their argument, as I understand it, is that that discriminates against dad based on his sex. You've got – if you kept all the facts the same and you had Davis coming to the U.S. in 82 with mom instead of dad coming in 82, and mom naturalized on the same schedule that dad did, then Davis would have, by operation of law, become naturalized, right? Possibly. But we do have a situation where the father was known and he could have been considered legitimated because of the Status of Children Act, in this court's precedent, which finds that the Status of Children Act in Cape Verde made the petition there. Well, but that presumes that we look at the Cape Verde statute, the same as Jamaica. And Jamaica has two statutes. And Jamaica, right, they're not identical. They're not identical. But I think in the Cape Verdean situation there, the country also had a statute or a rule requiring a father to assert paternity. And this court found that that didn't matter. The petitioner was still legitimated for purposes of 1432A3. But under Jamaica law, isn't it true that the only way that Davis could have been legitimated is if his biological parents married when they were together in the U.S.? Well, the way I read the Status of Children Act, and I believe it's under Section 10, the father could have applied for a declaration of paternity. And so that would have been one way for him to legitimate him. He also could have put his name on the birth certificate. I believe that's a process that one can do. So there are other ways besides marriage that Davis could have been legitimated. That's why this case is not Tenio, because it was not impossible for petitioner's father to legitimate him. Well, that's another point. I mean, I think you're on solid ground there. There were things that mom and dad could have done here differently to naturalize Davis. But as I understand their argument, they're saying if it had been mom instead of dad, by operation of law, no one had to do anything. By operation of law, Davis would have been naturalized. And the only reason Davis wasn't naturalized was because it was the man, not the woman. And that's the source of their as-applied gender discrimination claim. Well, we don't know that because, again, this is a situation where we have both of the parents alive and identified. And so it could have been. And parents can have reasons for not wanting their child to take the citizenship of another country. And so we don't know had his mother naturalized, possibly the father would have contested the citizenship issue. Well, how could he have? Because I thought we're operating on the premise that this is an unmarried couple. They never married. They never separated. The law says that as soon as mom naturalizes when the child's a minor, the child's naturalized by operation of law. It says that if the father, if paternity has not been established. And it hasn't here, right? Well, it has because all the parties in this case acknowledge who the father is. Well, we know who the father is, but you said paternity. We've been using the phrase legitimated, the word legitimated. Is there a difference? Well, the focus of 1432A3 is to establish paternity. And it's to establish who that person is such that their rights can be protected if they don't want their child to, for whatever reason, take the citizenship of another country. And so this doesn't mean to say paternity of the child has not been established. That sounds like something formal established. It's not like an assumption or an unwritten agreement. Right. Right. And I think here we don't have anything formal. I mean, we it's very strange because we're all sitting here, I think, opposing counsel and you and everyone else understands that Delroy is Davis's father. But it's never been, quote, established in a formal way. Right. I think the most formal way is from his immigration applications. He's been listed as the father. And that makes it true. I could see other cases where your office would come in and say, don't believe just because someone put that on there, don't believe that it's true. It doesn't make it true that someone puts that down there. They could be lying or mistaken. Correct. And I see I'm out of time. OK, I know we're speaking in hypotheticals here, but I do want to just focus on the fact that we have two living parents here. And the purpose of the statute is to protect their rights. And when we have two living identified parents, that is when the legal separation element is triggered. And so the legitimation clause is meant to be triggered when you have just one parent. Right. I asked your your adversary about sort of we have to decide whether in what we write, published, non-published, the amount of people this may apply to, maybe nobody else might have might be a determinative factor. Do you are you aware of others out there that that are facing this type of issue? I am. OK. Yes. Do you have any idea how many? Is it a large number of people? I can't speculate as to the number, but I know that this does impact people. OK. All right. OK. Thank you, counsel. Thank you. We'll hear rebuttal. Thank you, Anders. I'm hoping to get through maybe three or four points on rebuttal. So first on the I want to go back to maybe the Status of Children Act and the distinction. I think I can be drawn to the decree law in Cape Verde. So under the Status of Children Act, we have second six, which first says there's a presumption of paternity if there is a marriage. And then Section 10 says for all other circumstances, when there is no marriage, the mother initiates affiliation proceedings if the mother desires. And so I think previously I was talking about Cape Verde saying everything is crafted in terms of there being a presumption of paternity until someone challenges that presumption. Here is the reverse. You don't have the presumption unless the parents are married. And then if there is no presumption, then it's the mother that would essentially go and petition for affiliation. And that could be through the blood test, the DNA, that the rest of the statute covers. And so I think that takes it away from the context and brand out. Second, I heard my colleague from the government addressing the interest here concern is kind of this alien parent interest. And I think that's a that's a bit of a red herring here, because when we're looking just at legitimation, if the rules were reversed, as Judge Hardiman, you mentioned, Mr. Mr. Davis would be a citizen today, as in if his mother had naturalized when he was 16 and his father was was a parent, a capable parent all the same, but was simply did not naturalize yet. He wouldn't have a say in Mr. Davis's citizenship. Derivative citizenship would flow through the mother to Mr. Davis. And so the alien. I just want to make sure I understand that. So if we accept what you're telling us, which is that Davis's father had legal custody of him when he was 16. You're saying none of that matters. He would have derived he would have got derivative citizenship from his mother, despite his father having legal custody. Correct. That's right. Because I was asking before. OK, that's right. Yeah, because we would say his father was never legitimated him. Therefore, he never gets any rights to contest or otherwise say, you know, I don't want want Davis to become a U.S. citizen. I think the other part I want to address there, too, is, you know, this court in Teneo said, when we're looking at these protection challenges, we're concerned with the present day interest. Right. Does legitimation still satisfy the present day interest? And I think the interest in protecting the alien parent. This was also addressed in Brando has has really waned in the interim years. So in the Child Citizenship Act of 2000, Congress struck the original provision to say both parents would need to naturalize in order to confer citizenship in a legitimated situation. Instead, it replaced it with the transmission of citizenship through one parent. So long as that parent had legal and physical custody. And we know through the legislative notes that Congress made that revision because it wanted to broaden citizenship and wanted to ensure that people in more situations, so long as they had some ties to the United States, would be able to get citizenship. I think that concept is explored in the Second Circuit's case in Collett versus Sessions. Nine zero four F third one twenty nine, where they touch that. That again, the interest in the present day, as Congress has told us, is to ensure that the child has a connection first with the parents, but then second, the connection to the United States. Lastly, I just want to maybe go back to this legal custody point. And I think that that's been such a driving force. I heard my colleague from the government to say that that is also where a lot of her concern has been. And so I do think, yes, on that question, it would be, I think, a genuine dispute of material fact about whether Mr. Davis's father had legal custody such that any of these paths could flow and that he could transmit citizenship to his son. I don't know. Is it is it? Is that really the procedural posture here? You come out of a immigration proceeding where a whole record was made. You know, if it's your burden, if you don't, if you didn't prove it, aren't you out of luck? I think I would know first that Mr. Davis was pro se in front of the immigration court. And I think my reading of the transcript as it occurred, the judge, the immigration judge, asked certain questions and said, oh, are your parents married? Did this happen? And then turn to the government attorney and confirm those facts. The government said, no, they were never married. Therefore, it doesn't matter if his father ever naturalized. No citizenship can flow. And the judge took that. And that was the decision. So I don't know that the focus of the administrative proceedings was on the marriage separation issue. That's right. Equal protection issue isn't isn't there at all. That's right. And I would say, one, to your point, there's argument about jurisdiction. I think there is still an important jurisdictional interest for this court to be certain that if it's going to affirm any removal orders, it would be against someone that's not a U.S. citizen. But then secondarily, I think, Your Honor, we noted that the BIA can't address constitutional issues. And so it would have been futile for Mr. Davis to even raise that equal protection challenge below, because the board has no authority to issue a decision on those basis. And so that's why I think it would be appropriate for this. And isn't there isn't it sort of common sense that. When you're trying to answer the very weighty question of whether someone is or is not a United States citizen, that there should be a full, open, contested hearing. With all the trappings of under oath evidence, et cetera, in front of a fact finder, and that those facts should be found one way or the other in as detailed a fashion as possible by the fact finder. I do, Your Honor. And I think that's spoken to us by Congress through 1252 and giving the court this mechanism to transfer to district court. I think Congress was trying to say we should be very careful before, again, signing off on a removal order to make sure that that person is not a U.S. citizen subject to removal. And to Your Honor's point, to make sure all these facts are adequately found before that decision is made. Thank you very much. Thank you, counsel. We thank counsel for their excellent arguments today and their excellent briefing in this matter. If counsel are amenable, we'd like to greet you at sidebar and thank you more in a more personal way. We'll take the case under advisement. And Mr. Williams, if you could adjourn court. Thank you. Thank you.